**In re Patrick BUXTON, Sr., and Penny D. Buxton, Debtors**

**Bankruptcy No. 98–21121.**

United States Bankruptcy Court,
W.D. Louisiana,
Lake Charles Division.

Jan. 13, 1999.

Hamilton J. Chauvin, Jr., Lafayette, LA, for Keith A. Rodriguez, chapter 13 trustee.

Thomas A. Self, Alexandria, LA, for Patrick & Penny Buxton.

### REASONS FOR DECISION

GERALD H. SCHIFF, Bankruptcy Judge.

This case presents what seems to be an ever-present struggle between Congress and the Supreme Court regarding the extent to which individuals' religious freedoms may be limited.

### *FACTS*

On September 28, 1998, Patrick Buxton, Sr., and Penny D. Buxton ("Debtors") filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code and on that day an order for relief was duly entered. Keith A.

Rodriguez ("Trustee") is the standing chapter 13 trustee in this division. On the same day, the Debtors also filed a Chapter 13 Plan[1] ("Plan") as well as Schedule I (Current Income of Individual Debtors) and Schedule J (Current Expenditures of Individual Debtors).

The Plan proposes for the Debtors to pay the Trustee the sum of $322.00 per month for 2 months and $330.00 per month for a period of 58 months. The Debtors estimate a distribution of 3% to their unsecured creditors. Since, according to the Plan, the total of unsecured claims is approximately $7,500.00, the Trustee will distribute to unsecured creditors approximately $225.00.

Schedule I reveals that the Debtors have 5 children, ages 8 to 15 years, and that both Debtors are employed with a combined monthly income, net of taxes, health insurance premiums, and retirement contributions, of $3,024.16. Schedule J itemizes the Debtors' monthly expenses at $2,702.00, resulting in a surplus of $322.16 per month.

With the exception of one listed expense item, the Trustee does not contest the reasonableness of the Debtors' listed expenses. In fact, the Trustee acknowledged that the budget is indeed meager for a family of 7. The Trustee takes issue, however, with the Debtors' proposed charitable contributions in the amount of $280.00 per month, and, in fact, has objected to confirmation of the Plan on that account, contending that the Plan does not satisfy the "disposable income" standard of section 1325(b)(2).

The facts relating to the level of the Debtors' pre-petition charitable contributions are not in serious dispute[2]. Copies of the records of Christian Life Ministries, Oakdale, Louisiana, establish irregular donations from May 11, 1997, to May 17, 1998, in amounts ranging from $20.00 to $50.00, totaling $1,065.00, an average of $88.75 per month. In addition, the Debtors produced a copy of a money order receipt for $140.00, dated November 16, 1998, to the First United Pentecostal Church. If we average the total payments made of $1,205.00 for the total period involved, approximately 19 months, the Debtors average monthly charitable contribution was only $63.42. While the Debtors suggest they made additional cash contributions as offerings during church services at various times, they did not produce probative evidence as to the amount and frequency of such additional contributions. The court does, however, acknowledge that additional small cash contributions may have been made, although not in such amounts as to significantly raise their monthly average.

## DISCUSSION

The 1998 Act is the latest attempt by Congress to deal with certain issues relating to religious freedom. In *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that the guarantee of free exercise of religion contained in the First Amendment is not transgressed by an otherwise valid and neutral law of general applicability that only incidentally burdens religion.

In response to *Smith,* Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA") which prohibited the "government" from "substantially burden[ing]" a person's exercise of religion even if the burden results from a rule of general applicability unless the government demonstrated that such burden was in furtherance of a compelling governmental interest, and was the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1.

The 1998 Act came about as a direct result of the decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), wherein the Supreme Court declared

---

1. An Amended Plan was filed on November 30, 1998. Aside from increasing plan payments to $330.00 per month, the changes made by the amended plan are not material to the issues raised in the instant proceeding.

2. Counsel for the Debtors suggests that Congress' intent in enacting the Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L 105–183 ("1998 Act"), was to preclude the court from consideration of such facts. As will be set forth hereinafter, the court does not agree with this position insofar as the 1998 Act applies to section 1325(b)(2).

RFRA unconstitutional as being an improper attempt to exercise Congress' enforcement powers under the 14th Amendment, Section 5, in that the legislation contradicted vital principles necessary to maintain separation of powers and the federal-state balance.

The 1998 Act consists of the following 6 sections:

SECTION 1.  SHORT TITLE.

SECTION 2.  DEFINITIONS.

SECTION 3.  TREATMENT OF PRE–PETITION QUALIFIED CHARITABLE CONTRIBUTIONS.

SECTION 4.  TREATMENT OF POST–PETITION CHARITABLE CONTRIBUTIONS.

SECTION 5.  APPLICABILITY.

SECTION 6.  RULE OF CONSTRUCTION.

The 1998 Act amends the Bankruptcy Code in several [3] separate and distinct areas, including the following:

### (1) *Fraudulent Conveyances.*

Several instances have occurred, primarily in chapter 7 cases, where a trustee has successfully instituted section 548 avoidance actions to recover donations made by debtors to charitable organizations within the year preceding the bankruptcy filing. In such actions, the recovery was sought on the basis of the "constructive fraud" provisions of section 548(a)(2), which allows the trustee to avoid transfers made by an insolvent debtor within one year of bankruptcy where the debtor "received less than a reasonably equivalent value in exchange for such transfer." Holding that the benefits to the debtors resulting from such contributions were not "in exchange for such transfer" and did not constitute "value" within the meaning of § 548, the trustee was able to succeed in cases like *In re Bloch*, 207 B.R. 944 (D.Colo. 1997), *In re Newman*, 203 B.R. 468 (D.Kan.

1996), and *In re Gomes*, 219 B.R. 286 (Bkrtcy.D.Or.1998).

Designed to overturn this line of cases, Sections 2 and 3 of the 1998 Act amended section 548 in several respects [4]. First, a definition of "charitable contribution" was added.[5] Second, certain charitable contributions are now protected from attack by a trustee, provided that such contribution is made to a "qualified religious or charitable entity or organization," section 548(a)(2), and provided further that such contribution is no more than 15% of the debtor's gross income for the year in which the contribution is made, unless, if such contribution exceeds 15%, "the transfer was consistent with the practices of the debtor in making charitable contributions." Section 548(a)(2)(B).

### (2) *Abusive Filings.*

Prior to the 1998 Act, section 707(b) provided:

> (b) After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

This section was one of several consumer amendments added to the Bankruptcy Code in 1984 in response to the perceived abuse of chapter 7 by debtors who arguably had sufficient monthly income to repay some of their debt. *See, e.g., In re Walton*, 866 F.2d 981 (8th Cir.1989).

**3.** Section 3(b) of the 1998 Act places certain limitations on actions brought pursuant to section 544(b), which has no relevance to the instant case and will not be addressed herein.

**4.** The amendment to section 548 renumbers the subparagraphs, which could lead to some confusion while attempting to discuss the "new" and the "old" law.

**5.** Section 548(d)(3). To qualify as a charitable contribution under the section 548(d)(3), the fol-

lowing requirements must be satisfied: (a) the definition of "charitable contribution" in § 170(c), Internal Revenue Code of 1986 is adopted, (b) the donor is a natural person, (c) the contribution is either cash or a "financial instrument" [see § 731(c)(2)(C), Internal Revenue Code of 1986], and (d) the recipient is a "qualified religious or charitable entity or organization," as defined therein.

To determine whether a debtor's chapter 7 filing constitutes "substantial abuse" of the system, which is not defined in the Bankruptcy Code, courts are called upon to examine the debtor's income and expenses. The overwhelming majority of cases examine whether the debtor's future income could fund repayment of pre-petition debt, at a reasonable level, under the provisions of chapter 13. *Ibid.*

Obviously, the debtor's proposed future charitable contributions are but one of the items a court might consider in determining substantial abuse under section 707(b). While some courts have noted a debtor's charitable contributions as such an expense item, the court has not been able to locate a single case where the court found substantial abuse resulting solely from excessive charitable contributions.

Regardless, Section 4 of the 1998 Act removed certain charitable contributions from consideration by the court in section 707(b) cases:

In making a determination whether to dismiss a case under this section, *the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions* (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)). (Emphasis added.)

(3) *Chapter 13 Expenses.*

Section 1325 sets forth the standards for confirmation of chapter 13 plans. One of the standards, or tests, is known as the "disposable income" test, and generally requires debtors to dedicate all of their disposable income to the plan for a minimum of 36 months. Prior to the 1998 Act, section 1325(b) defined "disposable income" to mean the excess of monthly income over those expenses "reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor."

A substantial body of cases, however, have held that charitable contributions can never fall within the category of "reasonably necessary" expenses. *See, e.g., In re Lees,* 192 B.R. 756 (Bkrtcy.D.Mont.1994), *In re Tessier,* 190 B.R. 396 (Bkrtcy.D.Mont.1995); and *In re Miles,* 96 B.R. 348 (Bkrtcy.N.D.Fla.1989).

The Act overturned this restriction. As amended, section 1325(b)(2) now provides in relevant part (the underscored language in section 1325(b)(2)(A) was added by the 1998 Act):

(b) (1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –

\* \* \*

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended –

(A) for the maintenance or support of the debtor or a dependent of the debtor, *including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made;* and

\* \* \*

The interpretation of the amendment to section 1325(b)(2)(A) is at the heart of the dispute between the Trustee and the Debtors. The Trustee contends that while charitable contributions are now considered to be proper expenses by a debtor in a chapter 13 proceeding, such are subject to two limitations, namely, that (1) the amount of the contribution cannot exceed 15% of gross income, and (2) the amount of the contribution itself is reasonable.

The Debtors, on the other hand, take the position that the court is precluded from considering whether the contribution is reasonable, arguing that the intent of the 1998 Act was to permit, without question by the court, the debtors' right to make charitable contributions in an amount not exceeding 15% of a debtor's gross income.

For the following reasons, the court disagrees with the Debtors' restrictive interpretation of the 1998 Act:

(1) The definition of "disposable income" still contains the "reasonably necessary" restriction. Disposable income is still defined as income received by the debtor and which is not reasonably necessary to be expended for the maintenance and support of the debtor or a dependent of the debtor. The 1998 Act now makes it clear that such living expenses may *include* charitable contributions, thus overturning that line of cases which totally prohibited any charitable contribution by a chapter 13 debtor.

Congress, however, must have intended some limitation on a debtor's right to make charitable contributions, as the legislation only provides that such contributions may be included in the debtor's living expenses. Those expenses, however, must still be determined by the court to be reasonable.

This interpretation comports with those pre–1998 Act cases including one decided in this court[6], which conclude that a debtor is entitled to a reasonable level of charitable contributions under certain circumstances. *See, e.g., In re Cavanaugh*, 175 B.R. 369 (Bkrtcy.D.Idaho 1994). Such cases recognize that the reasonably necessary standard must be flexible and should permit a debtor some discretionary spending. *See, e.g., In re Gillead*, 171 B.R. 886 (Bkrtcy.E.D.Cal.1994).

The court believes that the following language from *In re Andrade*, 213 B.R. 765, 771 (Bkrtcy.E.D.Cal.1997), suggests an appropriate analysis of the reasonableness of a debtor's charitable contribution:

When a court does approve some discretionary spending as a reasonably necessary expense, debtors are free to spend that amount of income on recreation, vacation, charity, or anything else they choose. The courts should thus confirm tithing as a necessary expense, but only by virtue of the debtors' willingness to pay for it with their discretionary funds—not by virtue of its charitable or religious nature.

Furthermore, under this approach debtors have no right to "more discretionary income than other debtors merely because they wish to use some of it to make charitable [or religious] donations. [T]he debtors' expenses for charitable donations will be considered with their other discretionary funds when determining the reasonableness of charitable contributions." *In re Cavanaugh*, 175 B.R. at 374–74. Again, the reasonableness of allowing all or part of the discretionary spending, even if spent on charitable contributions, will be based upon the totality of the debtor's circumstances. *In re Reynolds*, 83 B.R. at 685. This is an inherently fact-based analysis.

(2) Had Congress intended the result suggested by the Debtors, it surely knew how to do so. Look at what they did to section 707(b). In determining whether a case constitutes a "substantial abuse" of the provisions of chapter 7, "the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions" within the limits imposed by the 1998 Act.

Had Congress wanted this same result in chapter 13 cases, they surely would have stated so with the same force in which they restricted application of section 707(b). However, they did not do so and the court can only conclude that they did not intend the same result.

■ In the instant case the court finds that the Plan does not satisfy the disposable income test of section 1325(b). This finding is based upon the following:

6. *Waguespack v. Rodriguez*, Bankruptcy Case Number 97–50932, Reasons for Decision rendered July 31, 1997, affirmed by the district court on January 27, 1998 (220 B.R. 31 (W.D.La. 1998)). On January 8, 1998, the Fifth Circuit dismissed the appeal for want of jurisdiction, finding that the denial of confirmation was not a final order for purposes of 28 U.S.C. § 158.

(1) While the Debtors seek to make charitable contributions of $280.00 per month, they will pay into the Plan only the sum of $322.00—$330.00 per month, and the unsecured creditors will receive only approximately $225.00 over the course of the entire Plan. The court finds this level of charitable contribution unreasonable under the circumstances.

(2) The evidence suggests that the Debtors did make charitable contributions prepetition, but at a significantly lower level than is included in their chapter 13 budget. The court finds that the proposed level of contribution is not reasonably necessary for the support of the Debtors or their dependents.

(3) The effect of the Debtors increasing their level of charitable contributions postpetition is to place the burden of their charitable contributions on their unsecured creditors. While the court believes that some discretionary spending in a chapter 13 budget is permissible, the level in this case is so high when compared to the pre-petition contributions as to suggest a lack of good faith on the part of the Debtors.

(4) As indicated above, the Debtors unsecured debt is approximately $7,500.00. A payment of $225.00 equates to a 3% dividend. If the Debtors were to amend their budget to reflect charitable contributions of $100.00 per month, which is more in line with the Debtors' pre-petition level of contributions, and which the court would deem to be reasonable, the unsecured creditors could be paid 100% of their claims within approximately 48 months, rather than the proposed 60 months.

A separate order in conformity with the foregoing reasons is this day being entered into the record of this proceeding.