In re Kevin T. CAVANAGH, Tina M. Evje–Cavanagh, Debtors.

**Bankruptcy No. 99–42161–13.**

United States Bankruptcy Court, D. Montana, Butte Division.

Jan. 7, 2000.

Robert G. Drummond, Chapter 13 Standing Trustee, Great Falls, MT, for the trustee.

R. Clifton Caughron, Caughron & Associates, Helena, MT, for the debtors.

## ORDER

RALPH B. KIRSCHER, Chief Judge.

In this Chapter 13 bankruptcy case, after due notice hearing was held at Great Falls on December 14, 1999, on confirmation of the Debtor's Chapter 13 Plan, filed September 10, 1999, as amended by addendum filed December 1, 1999; and on the Debtors' motion for exemption from wage withholding, filed December 1, 1999. The Trustee filed objections to confirmation on November 23, 1999, and on December 2, 1999, that the Plan fails to satisfy the "disposable income" requirement of 11 U.S.C. § 1325(b). The Debtors appeared at the hearing represented by counsel R. Clifton Caughron. Debtor Kevin T. Cavanagh ("Kevin") testified. The Trustee appeared in opposition to confirmation on the grounds that Kevin's charitable contributions to the Mormon Church violates the disposable income requirement of § 1325(b)(2)(A). No exhibits were admitted. At the close of the hearing the Court granted the Debtor five days to file a brief, and took the matter under advisement. Debtors filed their brief on December 21, 1999. The matter is ready for decision. At issue is whether the Debtors' $234 monthly charitable contributions to the Mormon Church is "disposable income" not reasonably necessary for the maintenance and support of the Debtors under § 1325(b)(2)(A). The Trustee's objections are overruled, for the reasons stated below, under the plain language of § 1325(b)(2)(A) allowing charitable contributions of up to 15 percent (15%) of the Debtors' gross income.

## FACTS

Kevin and his spouse/co-Debtor Tina M. Evje–Cavanagh ("Tina") are married and have one child, a one-year old daughter who was born premature. Tina is a member of the Mormon Church (hereinafter the "Church"). Until recently, Kevin was not a member. However, Kevin testified that the Church provided Kevin and Tina

with financial assistance during a period in which they were having financial difficulties as a result of their child's birth, which they used to pay phone bills and utility bills. Because of such assistance by the Church in their time of need, Kevin decided to join his wife's Church and to begin tithing a portion of his income to the Church.

Kevin testified that he had never tithed before his decision to join the Church, and that when he and Tina first were married she stopped her practice of tithing. Debtors filed the instant Chapter 13 petition, along with Schedules and Statements, on August 16, 1999. Shortly thereafter Debtors moved to North Dakota for Kevin's change of employment. . The Debtors' original Schedule I, filed with the petition, shows Kevin's gross monthly income of $2,416.66, and a net income of $2,056.24. Schedule J states expenses of $1,691.00, including $0.00 for charitable contributions, leaving $365.24 available for plan payments. The Statement of Financial Affairs, paragraph 7, lists "None" for gifts or charitable contributions within one year preceding the commencement of the case.

Debtors filed their Chapter 13 Plan on September 10, 1999, providing for monthly plan payments in the sum of $365 for 39 months. The Plan provides for $0 payment to the unsecured nonpriority creditors, and states at paragraph 5: "The Debtors will commit all disposable income to payments under the Plan and shall report any changes in income to the trustee as required by 11 U.S.C. § 1325(b)(2)(B)." The Trustee filed objections to confirmation on November 23, 1999, on the grounds of the Plan's treatment of Norwest Bank and because Kevin changed employment without updating Schedules I and J.

Debtors filed a response, an addendum to Plan, their motion to waive wage withholding, and amended Schedules I and J on December 1, 1999. The addendum to Plan pays Norwest Bank the amount of its allowed secured claim, $11,100.00, in accordance with Proof of Claim No. 7 filed by Norwest Bank on September 14, 1999, thereby curing the Trustee's objection based upon 11 U.S.C. § 1325(a)(5)(B)(ii). The amended Schedule I shows Kevin's gross income increased to $3,333.33, and Debtors' net income increased to $2,643.62. Amended Schedule J states increased expenses of $2,259.00, leaving $384.62 available to make Plan payments. The amended expenses include, for the first time, charitable contributions in the sum of $234.00 per month. The addendum to Plan provides for increased plan payments of $385 after the first three months, and a total plan term of 36 months.

The Trustee filed additional objections to confirmation on December 2, 1999, contending that Debtors' amended Plan fails to commit all of Debtors' disposable income as required by § 1325(b)(1)(B) because of the $234 monthly charitable contributions, and that the Plan has not been filed in good faith as required by § 1325(a)(3).

Kevin testified that Debtors filed their Chapter 13 petition in order to keep their motor vehicle, a 1997 Ford Taurus. Debtors were faced with the loss of the vehicle after the premature birth of their daughter, which caused Tina to quit her job. Because of the assistance from the Church, Kevin decided to join the Church and begin tithing a portion of his income.

The Debtors' $234 monthly contributions to the Church represent just over 7% of Kevin's present gross income of $3,333.33. Kevin testified that tithing is not required as a condition of membership in the Mormon Church, but is "strongly recommended". Kevin testified that he believes that his charitable contributions will have the result that he will receive raises and bonuses in his employment, and that the more he gives the more he will receive.

## DISCUSSION

The Trustee objects that the Debtors' amended Plan fails the "disposable

income" test under § 1325(b)(1)(B), which provides:

(b)(1) If the trustee ... objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

\* \* \* \*

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to made payments under the plan.

Debtors' Plan commits their future earnings and other income to the supervision and control of the Court, and specifically provides that the "Debtors will commit all disposable income to payments under the Plan and shall report any changes in income to the trustee as required by 11 U.S.C. § 1325(b)(2)(B)."

"Disposable income" is defined at § 1325(b)(2):

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section § 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made . . . .

There is no contention that the Debtors' $234.00 monthly contributions to the Church do not meet the definition of "char-

itable contribution", or that the Mormon Church is not a qualified religious or charitable entity[1] for purposes of § 1325(b)(2)(A).

Section 1325(b)(2) was amended to allow charitable contributions in § 1325(b)(2)(A) by the Religious Liberty and Charitable Donation Protection Act of 1998[2]. The 1998 Act was a response to the decision in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) wherein the Supreme Court held that the Religious Freedom Restoration Act of 1993 ("RFRA") was unconstitutional. *See In re Buxton*, 228 B.R. 606, 607–08 (Bankr. W.D.La.1999). The 1998 Act overturned a line of cases holding that charitable contributions were not expenses which were reasonably necessary for the maintenance or support of the debtor or debtor's dependents. *Buxton*, 228 B.R. at 609 (*citing cases* ).

The Trustee's objection is based upon *Buxton*, in which the court adopted as an additional limitation to charitable contributions a "reasonableness" standard articulated in *In re Andrade*, 213 B.R. 765, 771 (Bankr.E.D.Cal.1997). *Buxton*, 228 B.R. at 610. Under the reasonableness standard, which is an "inherently fact based analysis", charitable contributions are allowable as a reasonably necessary expense "but only by virtue of the debtors' willingness to pay for it with their discretionary funds—not by virtue of its charitable or religious nature". *Andrade*, 213 B.R. at 771; *Buxton*, 228 B.R. at 610. The court in *Buxton* reasoned that Congress must have intended some limitation on a debtor's right to make charitable contributions, and that the court must still determine whether those expenses are reasonable. *Buxton*, 228 B.R. at 610.

In this Court's view such reasoning ignores the plain language of

---

**1.** Section 548(d)(4) provides that "qualified religious or charitable entity or organization means (A) an entity described in section 170(c)(1) of the Internal Revenue code of 1986; or (B) an entity or organization de-

scribed in section 170(c)(2) of the Internal Revenue Code of 1986."

**2.** Pub.L. No. 105–183 (1998).

§ 1325(b)(2)(A), which sets forth Congress' specific intention to establish a limit for charitable contributions at 15 percent of the Debtor's gross income. Section § 1325(b)(2)(A) includes in disposable income, income received by the debtor which is not reasonably necessary to be expended "(A) for the maintenance or support of the debtor or a dependent of the debtor, *including charitable contributions ... in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made".* § 1325(b)(2)(A). The Court finds this section is not ambiguous.

■ A fundamental maxim of statutory interpretation is that courts must presume that a legislature says in a statute what it means and means in a statute what it says there, and when the words of a statute are clear, our inquiry is at an end. *Connecticut National Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391 (1992); *United States v. Morales,* 108 F.3d 1031, 1036 (9th Cir.1997); *Blockbuster Videos, Inc. v. City of Tempe,* 141 F.3d 1295, 1298 (9th Cir.1998). In light of the plain language of § 1325(b)(2)(A) authorizing charitable contributions of up to 15% of a debtor's gross income in determining a debtor's disposable income, this Court declines to adopt the reasonableness test in *Andrade.*

The court in *Buxton* applied the *Andrade* test because "Congress ... must have intended some limitation on a debtor's right to make charitable contributions...." *Buxton,* 228 B.R. at 610. Congress specifically established such a limitation at 15% of the Debtors' gross income by the plain language of § 1325(b)(2)(A), and this Court's enquiry is at an end. *Connecticut National Bank v. Germain,* 503 U.S. at 253–54, 112 S.Ct. at 1149–50; *United States v. Morales,* 108 F.3d at 1036; *Blockbuster Videos, Inc. v. City of Tempe,* 141 F.3d at 1298. Debtors' $234 monthly charitable contributions total just over 7% of their gross income, well within the limitation established by

§ 1325(b)(2)(A). As a leading commentator notes: "[T]he amount a debtor may contribute is limited to 15 percent of the debtor's gross income for any particular year." 8 Lawrence P. King, *Collier on Bankruptcy,* ¶ 1325.08[4][b][iii] (15th ed.1999).

In the Ninth Circuit *Andrade* was recognized as abrogated in *Sutton v. Providence St. Joseph Medical Center ("Sutton"),* 192 F.3d 826, 833–34 (9th Cir.1999), where the court of appeals assumed that RFRA was constitutional as applied to federal law, even in light of the decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *Sutton,* 192 F.3d at 831, 833–34. With the Ninth Circuit Court of Appeals rejecting the reasoning of *Andrade* as unpersuasive, this Court declines to follow the court's lead in *Buxton* in keeping alive the reasonableness analysis of a Debtor's charitable contributions set forth by *Andrade,* 213 B.R. at 771. The Ninth Circuit makes clear in *Sutton* that RFRA is constitutional as applied to federal law. *Sutton,* 192 F.3d at 833–34. With the enactment of § 1325(b)(2)(A), Congress provided a specific limitation on a debtor's right to make charitable contributions. With Congress providing a 15% limit to charitable contributions, its intent is clear from the plain language of § 1325(b)(2)(A), and the *Andrade* reasonableness analysis adopted by *Buxton* adds an analysis and further limitation which is not set forth or provided by the statute, and is not adopted in this Court.

■ Finally, the Trustee's objection contends that Kevin's proposed charitable contributions show that the Plan is not proposed in good faith. Like the trustee in *Buxton,* the Trustee contends that Kevin did not make charitable contributions to the Mormon Church before this bankruptcy case commenced, and the Plan provides for $0 payment to unsecured creditors while Kevin makes charitable contributions to his new Church simply because he believes it is important.

The good faith requirement is set forth at § 1325(a)(3), which provides that the Court *shall* confirm a plan if "(3) the plan has been proposed in good faith and not by any means forbidden by law." With Kevin's charitable contributions well within the 15% limit allowed by § 1325(b)(2)(A), this Court is reluctant to hold that, having passed that hurdle, the Debtors have nonetheless failed to propose their Plan in good faith because of the same charitable contributions. The Court observed Kevin's demeanor while testifying under oath, and finds no reason to doubt his credibility or the sincerity of his religious conversion and beliefs regarding tithing.

Furthermore, Congress made no distinction in § 1325(b)(2)(A) between new or increased charitable contributions versus pre-petition contributions. By contrast, in 11 U.S.C. § 548(a)(2)(B), Congress demonstrated its ability to draft a statute in such a manner to include a debtor's past practices in making charitable contributions:

> (2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—

> \* \* \* \*

> (B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), *if the transfer was consistent with the practices of the debtor in making charitable contributions.*

(Emphasis added).

Congress having made no such distinction between past and present practices of the debtor in making charitable contributions in § 1325(b)(2)(A), this Court will make none. *Collier on Bankruptcy* notes:

> In most cases the 15 percent is more than a debtor is likely to contribute or to have contributed in the past. However, the language appears to permit a debtor to increase contributions after bankruptcy if the debtor would prefer to make contributions to charity rather than pay greater amounts to unsecured creditors. It is doubtful whether a bankruptcy court would have the authority to find such contributions to be not reasonably necessary now that Congress has set a specific amount that it has defined as reasonably necessary.

8 *Collier on Bankruptcy* ¶ 1325.08[4][b][iii].

In conclusion, the Court finds that the Debtors' $234 monthly charitable contributions are authorized under § 1325(b)(2)(A), and that the Trustee failed to show that the Debtors did not propose their Plan in good faith.

IT IS ORDERED the Trustee's objections to confirmation, filed November 23, 1999, and December 2, 1999, are overruled; the Debtors' motion for exemption from wage withholding, filed December 1, 1999, is granted; a separate Order shall be entered confirming the Debtors' amended Chapter 13 Plan filed September 10, 1999, as amended by addendum filed December 1, 1999, without the standard wage withholding provision set forth at paragraph 3(1) of the Court's standard Order; and the Debtors shall make their plan payments directly to the Trustee.