In re Alan J. **KIRSCHNER** and Joyce J. **Kirschner, Debtors.**

No. 00–1814–3F3.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

March 14, 2001.

---

Mamie L. Davis, Standing Chapter 13 Trustee, Jacksonville, FL.

Michael S. May, DeLand, FL, for Debtors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court for confirmation of the Third Amended Chapter 13 Plan ("Third Amended Plan") filed by Alan J. Kirschner and Joyce J. Kirschner ("Debtors") on December 21, 2000. (Doc. 22.) The Standing Chapter 13 Trustee ("Trustee") objected to confirmation of the Third Amended Plan at a hearing held on January 30, 2001. (Doc. 25.) The Court took the matter under advisement and so-licited submissions from the parties. Upon review of the evidence presented and upon review of arguments and submissions of counsel, the Court finds that Debtors' Third Amended Plan should be confirmed.

### FINDINGS OF FACT

On March 9, 2000, Debtors filed for Chapter 13 bankruptcy protection.

On March 9 Debtors also filed the requisite schedules. (Doc. 2.) According to Debtors' Schedule I, their gross monthly income was $6407.00 and their net monthly income was $4,889.78. According to Debtors' Schedule J, their monthly expenses came to $3,027.89, leaving Debtors with a monthly surplus of $1861.89. Debtors included as a monthly expense $696.00 in charitable contributions. Debtors' other expenses included $120.00 for telephone, $32.00 for satellite television, $200.00 for home maintenance, $660.00 for food, $150.00 for clothing, $75.00 for laundry and dry cleaning, $200.00 for medical and dental expenses, $350.00 for transportation apart from car payments, $200.00 for recreation, and $135.00 for auto insurance.

In their Statement of Financial Affairs Debtors list their annual gross income as $83,399.00, or $6949.92 monthly.

Debtors' Schedule F indicates that Debtors owed $97,217.90 to unsecured, nonpriority creditors.

Debtors also filed their first Chapter 13 Plan with their petition and schedules. (Doc. 4.) The Plan proposed to surrender to Trustee $1,861.89 per month for 36 months. The Plan provided for a distribution of $111.23 per month to unsecured nonpriority creditors in months thirteen through eighteen and $358.30 per month to unsecured nonpriority creditors for the remainder of the Plan.

On May 1, 2000, a meeting of creditors was held pursuant to 11 U.S.C. § 341. (Doc. 11.) At the meeting Trustee questioned Debtors about the discrepancy between their gross monthly income as de-

clared in Schedule I and their gross annual income as noted in the Statement of Financial Affairs.

As of July 31, 2000, the claims bar date, $108,866.86 in unsecured nonpriority claims had been filed.

On August 18, 2000, Debtors filed a thirty-six month Amended Chapter 13 Plan ("Amended Plan"). (Doc. 12.) Under the Amended Plan, Debtors offered to surrender to Trustee $1,861.89 in months one through five and $1,883.06 monthly for the remainder. The Amended Plan provided for a distribution of $19.90 to unsecured nonpriority creditors in months six through twelve, $129.05 to unsecured nonpriority creditors in months thirteen through eighteen, and $213.46 to unsecured nonpriority creditors in months nineteen through thirty-six.

On August 29, 2000, Trustee filed an Objection to Confirmation of Debtors' Amended Chapter 13 Plan. (Doc. 15.) Trustee argued that Debtors' failed to contribute all of their disposable income into the Plan by trimming their surplus with excessive expenses. Trustee further alleged that Debtors failed to produce accurate documentation of their financial situation, thus thwarting Trustee's attempts to determine the feasibility and good faith of Debtors' Plan.

On October 23, 2000, Debtors filed an Amendment to their Schedules I and J. (Doc. 16.) Debtors increased their stated monthly net income to $5,398.69. Debtors also increased their stated monthly expenses to $3,363.00. Debtors increased their allocation for charitable contributions to $854.00 from the original $696.00. Debtors additionally increased their allocation for home maintenance to $341.00 from the original $200.00.

On October 23 Debtors also filed a thirty-six month Second Amended Chapter 13 Plan ("Second Amended Plan") reflecting those adjustments of income and expenses. (Doc. 17.) Under the Second Amended Plan Debtors offered to surrender to Trustee $1,861.89 per month in months one through five, $1,883.06 in months six and seven, and $2,035.69 monthly for the remainder. The Plan proposed to distribute $19.90 per month to unsecured nonpriority creditors in months six and seven, $183.73 to unsecured nonpriority creditors in months eight through twelve, $292.88 per month to unsecured nonpriority creditors in months thirteen through eighteen, and $377.29 per month to unsecured nonpriority creditors in months nineteen through thirty-six.

On November 21, 2000 the Court denied confirmation of Debtors' Second Amended Plan. (Doc. 20.) The Court found Debtors' charitable contribution excessive in amount and found Debtors' home maintenance expense excessive in amount and excessively speculative.

On December 21, 2000, Debtors filed a second Amendment to their Schedule J. (Doc. 21.) Debtors reduced their proposed charitable contribution expense to $674.00 and reduced their proposed home maintenance expense to $120.00.

On December 21 Debtors also filed the Third Amended Plan. Under the Third Amended Plan Debtors propose to surrender to Trustee $1861.89 per month in months one through five, $1883.06 in months six and seven, $2,035.69 in months eight and nine and $2436.69 monthly for the remainder. Trustee would distribute to unsecured nonpriority creditors any surplus left over from those payments after distribution to secured and priority claimants.

At the hearing on January 30, 2001, Trustee renewed her objections to Debtors' expenses in general and to Debtors' charitable contribution expense in particular. (Doc. 25.) Trustee argues that some of the charitable contribution expense was not reasonably necessary for Debtors' maintenance and support and therefore constituted unapplied disposable income under 11 U.S.C. § 1325(b). Trustee further asserts that the excessive charitable

contribution evidenced Debtors' lack of good faith in proposing a Chapter 13 plan to deal with their creditors pursuant to 11 U.S.C. § 1325(a)(3).

Neither side presented any evidence as to the sincerity of the religious beliefs motivating Debtors' charitable contributions. Neither party brought forward any evidence as to Debtors' history of charitable giving.

## CONCLUSIONS OF LAW

The Court divides the issues before it into two questions presented. First, may a Debtors' charitable contributions be treated as disposable income that must be distributed to creditors under § 1325(b)? Second, may evidence of a reservation of a charitable contribution expense alone establish a lack of good faith sufficient to deny confirmation pursuant to § 1325(a)(3)?

## I. CHARITABLE CONTRIBUTIONS AS DISPOSABLE INCOME

### A. The disposable income standard and charitable donation "exemption"

■ Under 11 U.S.C. § 1325(b), a debtor must contribute all of his disposable income into a Chapter 13 plan if a trustee or unsecured creditor objects to confirmation of the plan. Section 1325(b) provides, in relevant part:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made . . .

11 U.S.C. § 1325(b)(2001). Section 548(d) provides, in relevant part:

(d)(3) In this section, the term "charitable contribution" means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution—

(A) is made by a natural person; and

(B) consists of—

(i) a financial instrument . . . ; or

(ii) cash.

(d)(4) In this section, the term "qualified religious or charitable entity or organization" means—

(A) an entity described in section 170(c)(1) of the Internal Revenue Code of 1986; or

(B) an entity or organization described in section 170(c)(2) of the Internal Revenue Code of 1986.

11 U.S.C. § 548(d) (2001).

■ Congress added the provision for charitable contributions to the definition of "disposable income" in the Religious Liberty and Charitable Donation Act of 1998 ("the RLCDA"), Pub.L. No. 105–183. The RLCDA attempted to overrule those bankruptcy courts that found that charitable contributions were per se not reasonably necessary for the support or maintenance of a debtor and thus constituted § 1325(b)(1) disposable income that must

be applied to Chapter 13 plan payments. *See Drummond v. Cavanagh (In re Cavanagh)*, 250 B.R. 107, 111 (9th Cir. BAP 2000). Congress intended for the RLCDA to "protect the rights of debtors to continue to make religious and charitable contributions after they file for bankruptcy relief." H.R.Rep. No. 105–556 (105th Cong.).

■ The Court finds it useful to characterize the RLDCA charitable contribution provision as a sort of "exemption." The RLDCA essentially provided that qualified charitable contributions, in an amount less than a certain percentage of a debtor's income, may not be "attached" by a trustee or an unsecured creditor seeking more distribution under a Chapter 13 plan, in the same way that a debtor may not be obligated to contribute to a Chapter 13 plan funds conclusively exempted under 11 U.S.C. § 522(1). *See In re Graham*, 258 B.R. 286, 293 (Bankr.M.D.Fla.2001).

### B. The split over a vestigial "reasonably necessary" requirement

Unfortunately Congress did not place the RLDCA charitable contribution "exemption" in a stand-alone subsection. The "exemption" was placed in subsection (b)(2)(A), which remains qualified by the phrase "reasonably necessary to be expended." Some courts write this off as a drafting oversight and find that a qualified contribution of less than fifteen percent of a debtor's gross income need not undergo "reasonably necessary" scrutiny. *See Cavanagh*, 250 B.R. at 112. Once qualified under § 548(d), a proposed charitable contribution expense becomes per se reasonably necessary and "exempt" from the "disposable income" objections of creditors and trustees. *See id.* "The clear and unmistakable message [of the RLDCA] is that the interests of creditors are subordinate to the interests of charitable organizations, and we must follow this mandate." *Id.* at 113.

Other courts, however, find that, in addition to the § 548(d) qualifications and

fifteen percent limit, a charitable contribution must also be itself "reasonably necessary" in order to be "exempted" from treatment as disposable income. *See In re Buxton*, 228 B.R. 606, 610 (Bankr. W.D.La.1999). "The definition of 'disposable income' still contains the 'reasonably necessary' restriction ... such [necessary] living expenses may *include* charitable contributions ... [t]hose expenses, however, must still be determined by the court to be reasonable." *Id.* at 610 (italics original). The *Buxton* court reasoned that Congress did not intend to establish an automatic 15% "exemption," but rather intended to prevent courts from finding charitable contributions per se unreasonable. *See id.*

### C. Rejection of the vestigial "reasonably necessary" requirement

■ The Court finds the reasoning of the *Cavanagh* decision more persuasive, and therefore concludes that a § 548(d)-qualified charitable contribution, whether "reasonably necessary" or not, may not be treated as unapplied disposable income if the contribution amounts to less than fifteen percent of a debtor's gross income.

■ The main difficulty with the vestigial reasonability requirement adopted in *Buxton* is that it completely obviates the intended goal of the RLDCA, namely to protect certain charitable contributions from the consideration-based, cost/benefit oriented disposable income test. Congress, in enacting the RLDCA, recognized that, compared to the sort of expenses generally considered reasonably necessary, such as electricity, food and transportation, charitable contributions would always look unreasonable, because a debtor receives no legal consideration for them.

■ Congress enacted the RLDCA in order to create a "safe haven," an "exemption," to protect a debtor's ability to make some charitable donations after filing for bankruptcy despite the lack of consideration received in exchange for those outlays. Allowing a court to apply a

"reasonably necessary" qualification to the charitable contributions provision would thwart that stated purpose of the RLDCA. Courts would be compelled by precedent and common sense to conclude that a religious gift could never be reasonably necessary for support in the same economic sense as food expenditures or the cost of transport to a place of employment. The only lasting effect of the RLDCA would be to deprive courts of the power to find all such contributions unnecessary as a matter of law and thus provide a debtor with a futile evidentiary hearing at which to defend his contributions as reasonably necessary. Surely Congress did not intend the RLDCA to serve such a limited purpose.

The Court in *Buxton* feared that a charitable contribution "exemption" freed from the reasonableness requirement would create an opportunity for limitless abuse by debtors seeking to hide discretionary income from creditors. "Congress ... must have intended some limitation on a debtor's right to make charitable contributions ..." *Buxton,* 228 B.R. at 610.

■ There is no need to preserve the "reasonably necessary" requirement on such grounds, however, because more rational limitations do exist. The first limitation is obvious: Congress explicitly limited the religious giving "exemption" to fifteen percent of a debtor's gross income. The Court also thinks it appropriate to limit potential abuse by providing for monitoring of contributions in order to insure that the stated charitable donations are actually made to a qualified religious entity rather than used as discretionary spending by a debtor. Finally, any attempt by a debtor to claim an amount as

"exempt" from treatment as disposable income under the RLDCA must pass the good faith test found in § 1325(a)(3).

■ Therefore the Court adopts a three-step test for "exemption" of charitable contributions from treatment as disposable income under § 1325(b)(2)(A). First, a contribution must be a "charitable contribution" as defined by § 548(d)(3). Second, a contribution must be made to a "qualified religious or charitable entity or organization" as defined by § 548(d)(4). Finally, a court may not confirm a proposed Chapter 13 plan that provides for a § 548(d)-qualified contribution in excess of fifteen percent of a debtor's gross income.[1]

### D. Application to the instant case

#### 1. Qualification as a "charitable contribution" and as a "religious or charitable entity" under § 548(d)

■ Neither party brought forward evidence or addressed these standards at the hearing or in their submissions. Trustee did not assert that the charitable contributions proposed in Debtors' Schedule I were not IRS-qualified or that the church Debtor intended to give to was not IRS-qualified. Therefore the Court finds that Debtors' proposed contribution satisfies the § 548(d) standards. Debtors' failure to apply that portion of their income dedicated to charitable contributions may not justify denial of confirmation on unapplied disposable income grounds unless the amount to be contributed exceeds fifteen percent of Debtors' gross income.

#### 2. The fifteen percent limitation

Debtors' proposed contributions do not exceed fifteen percent of Debtors' gross

---

1. The Court here notes the distinction between its conclusions here and its findings in *In re Burgos,* 248 B.R. 446 (Bankr.M.D.Fla. 2000). In *Burgos,* the court found the expense of sending debtor's children to a private religious school "reasonably necessary" under § 1325(b). *See id.* at 450. In the instant case, the Court concludes that religious contributions qualified under § 548(d) need not undergo the "reasonably necessary" determination at all, because Congress intended to

elevate such contributions above the "reasonably necessary" test. Congress has yet to so protect tuition expenses for religious private schools. The fact that such schools provide consideration—an education—in exchange for such reserved expense indicates that such tuition expenses may be "reasonably necessary" in their own right (as the Court concluded in *Burgos* ) without a congressional "exemption."

income. Debtors assert a contribution expense of $674.00 per month, according to their second Amended Schedule J. Debtors' gross monthly income is $ 7,147.19, according to their Amended Schedule I. Debtors propose to spend just over nine percent of their gross income on charitable contributions, well under the fifteen percent cap.[2] Therefore, Debtors' planned charitable contribution expenditure falls within the amount allowed by § 1325(b)(2)(A), and that amount will not be considered unapplied disposable income.

The Court will now proceed to the merits of Trustee's second objection, namely that Debtors' intent to reserve a charitable contribution expense evidences a lack of good faith in light of the amount of unsecured debt Debtors intend to discharge.

## II. CHARITABLE CONTRIBUTIONS AS EVIDENCE OF A LACK OF GOOD FAITH

 In order to qualify for confirmation, a Chapter 13 Plan must satisfy all of the requirements of § 1325. The Court's finding that Debtors' charitable contributions do not violate the § 1325(b) disposable income test does not preclude successful opposition to Debtors' plan on other grounds. Nor does the invocation of a Congressional "exemption" prevent the use of the proposed "exempt" expenditure as evidence of a lack of good faith under § 1325(a)(3).

### A. The § 1325(a)(3) good faith standard

### 1. Relevance of reservation of property or income "exempt" from treatment as disposable income

 The reservation of a qualified charitable contribution expense, although an allocation protected from the disposable income inquiry under § 1325(b), may nevertheless evidence a lack of good faith in proposing a Chapter 13 plan under § 1325(a)(3). *See Cavanagh,* 250 B.R. at 114. As the *Cavanagh* court stated,

> Although the plain language of § 1325(b)(2)(A) does not restrict the timing of a debtor's tithing or prevent a debtor from increasing the amount of a charitable contribution on the eve of bankruptcy or after a bankruptcy petition is filed, these are factors that ought to be taken into consideration when looking at the totality of the circumstances to determine whether a debtor has proposed a chapter 13 plan in good faith and in compliance with § 1325(a)(3).

*Id.* As the Court previously noted in reviewing another sort of per se "indisposable" income, "although the personal injury settlement became conclusively exempt, and perhaps conclusively 'indisposable' . . . the Court maintained the power to withhold confirmation of the Plan on § 1325(a)(3) good faith grounds until the moment of confirmation." *Graham,* 258 B.R. 286, 293, fn. 2.

### 2. Sincerity of belief as a factor in cases where a reserved charitable contribution expense is advanced as evidence of a lack of good faith

 First, the Court finds relevant to the good faith inquiry the sincerity of a debtor's intent to actually make the proposed charitable contributions. The *Cavanagh* court, in finding that a debtor proposed in good faith a plan reserving a qualified charitable contribution expense, found that the bankruptcy court observed the debtor's demeanor sufficiently to sup-

---

**2.** The Court notes that Debtors have risked violating a somewhat higher mandate by trimming their religious contribution below ten percent of their gross income in order to get their Chapter 13 Plan confirmed. "To whom also Abraham gave a tenth part of all; first being by interpretation king of righteousness, and after that also King of Salem, which is, King of peace." *Hebrews* 7:2.

port its finding that the debtor's religious beliefs were sincere and that the debtor had not "suddenly found God" as claimed by the objecting trustee. *See Cavanagh,* 250 B.R. at 113. The *Cavanagh* court found that this "sincerity test" effectively thwarts attempts by unscrupulous debtors to hide extra discretionary income under the guise of the charitable contribution "exemption." *See id.*

### 3. The *Kitchens* "totality of the circumstances" test

 The Court also finds it necessary to analyze a proposed charitable contribution expense in the context of the "totality of the circumstances" good faith standard adopted by the Eleventh Circuit in *Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens),* 702 F.2d 885 (11th Cir. 1983). The *Buxton* court focused on similar all-purpose good faith factors in finding that a debtor should be denied confirmation based upon the size of the proposed charitable contributions in relation to the extent of debtor's unsecured debts and the amount of proposed plan payments. *See Buxton,* 228 B.R. at 611.

The *Kitchens* court set down eleven factors to be considered in determining whether, under the totality of the circumstances, a debtor proposed a Chapter 13 plan in good faith:

(1) the amount of the debtor's income from all sources;

(2) the living expenses of the debtor and his dependents;

(3) the amount of attorneys' fees;

(4) the probable or expected duration of the debtor's chapter 13 plan;

(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of chapter 13;

(6) the debtor's degree of effort;

(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;

(8) special circumstances such as inordinate medical expense;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;

(10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors;

(11) the burden which the plan's administration would place on the trustee.

*Kitchens,* 702 F.2d at 888–89.

### B. Application to the instant case

### 1. The "sincerity" inquiry

 The Court finds that Debtors sincerely intend to make the charitable contributions listed in their amended Schedule J. Debtors indicated their intent to reserve some of their income for charitable contributions on their original Schedule I. Absent any evidence to the contrary, this indication satisfies the Court that Debtors gave to their church prepetition and merely intend to continue giving to their church postpetition. There is no evidence before the Court tending to show that Debtors invented the charitable contribution expense solely to keep extra discretionary income outside their creditors' grasp.

### 2. The *Kitchens* "totality of the circumstances" test

The Court finds that the totality of the circumstances indicate that Debtors proposed the Third Amended Plan in good faith. Trustee failed to bring forward sufficient evidence to convince the Court that confirmation of Debtors' Third Amended Plan would constitute an abuse of the provisions of Chapter 13. Debtors' Third Amended Plan provides for a relatively large twenty-one percent distribution to unsecured creditors. Debtors' adjusted expenses appear reasonable on their face, and Trustee failed to bring specific evidence on the excessiveness of any of them. Debtors do not appear to be keeping any extravagant assets. Debtors do not propose to discharge any debts nondischargeable under Chapter 7.

**426**

The relative size of the qualified charitable contribution expense alone cannot justify a finding of lack of good faith, much as the reservation of a valuable piece of exempt property or lucrative exempt income stream alone cannot justify such a finding. Trustee presented no evidence of a lack of good faith besides Debtors' intent to make charitable contributions, the amount of unsecured debt to be discharged, and the length of the Third Amended Plan. Trustee failed to bring forward any evidence tending to show that Debtors did not sincerely desire to pay off as much as reasonably possible to their unsecured creditors during the span of a standard three-year Chapter 13 plan. Trustee simply made bare assertions that Debtors could afford to pay more and suggested that an additional amount should come out of the "exempt" charitable contribution expense. Such an assertion without more constitutes mere second-guessing and does not justify denial of confirmation.

Therefore, the Court finds that Debtors proposed the Third Amended Plan in good faith and that the Plan should be confirmed.

### III. MONITORING OF DEBTORS' CHARITABLE CONTRIBUTIONS

 The Court finds that, although Debtors' charitable contributions do not constitute unapplied disposable income and do not indicate lack of good faith so as to prevent confirmation, Debtors should be obliged to provide documentation to Trustee that the amount allocated to charitable expenses is actually given to the § 548(d)-qualified charitable entity. Such proof should be easy to provide. For example, Debtors could request that their church provide them with a receipt for their contributions, as it provides a receipt for those seeking tax deductions for charitable giving. Debtors will supply Trustee with documentation of their contributions along with their monthly plan payments. Trustee may file any motion she deems appropriate to enforce these monitoring provisions.

### CONCLUSION

The Court finds that Debtors' § 548(d)-qualified charitable contribution expenses of less than fifteen percent of their gross income may not be treated as unapplied disposable income in order to justify denial of confirmation on § 1325(b) grounds. The Court also finds that the size of Debtors' proposed charitable contributions alone does not sufficiently evidence a lack of good faith in order to justify denial of confirmation on § 1325(a)(3) grounds. The Court finally concludes that it is appropriate to mandate that Debtors provide documentation of their charitable giving to Trustee in order to ensure that Debtors are not fraudulently using the income allocated for charitable contributions as discretionary funds.

Trustee will prepare and submit an Order Confirming Plan in accordance with these Findings of Fact and Conclusions of Law, including a provision requiring Debtors to submit such proof as will satisfy Trustee that Debtors are actually making the proposed charitable contributions to a § 548(d)-qualified entity.