In re James Kenneth REESE, Debtor.

No. 01–2312–3F3.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Feb. 1, 2002.

Robert Altman, for Debtor.

Aaron R. Cohen, Jacksonville, FL, for Triple Check.

Mamie L. Davis, Trustee.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

JERRY A. FUNK, Bankruptcy Judge.

This case came before the Court upon an Objection to Debtor's claim of exemptions and an Objection to Confirmation filed by Triple Check Tax Service, Inc. ("Triple Check"). The Court conducted a hearing on October 24, 2001. In lieu of oral argument, the Court instructed the parties to submit briefs and proposed findings of fact and conclusions. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

In 1990 James Reese ("Debtor") began working as an independent contractor for Triple Check, a corporation which provides financial services such as tax preparation, security transactions, insurance sales, accounting and bookkeeping, and incorporations. Debtor's duties included preparing tax returns and performing financial services. In 1992 Debtor formed JKR, Inc. ("JKR"), a Florida corporation of which Debtor was the only shareholder and officer. Debtor testified one of the reasons he formed JKR was to avoid payroll taxes. On November 22, 1996 JKR and Triple Check entered into an agreement (the "Agreement") which provided that JKR would be an exclusive tax return preparer, registered representative, and licensed insurance agent to Triple Check through its principal, Debtor. In exchange, Triple Check agreed to pay JKR 50% of all fees collected for the preparation of tax returns, 80% of all commissions collected for security transactions, and 80% of all commissions collected for insurance sales.

The Agreement contained a non-solicitation covenant whereby JKR agreed that it would not "call upon, solicit, divert or take away or attempt to solicit, divert or take away any of the clients, suppliers or employees of Triple Check." (Triple Check's Ex. 11.)

On October 16, 1997 Debtor wrote a letter to an attorney inquiring as to the enforceability of the non-compete and the non-solicitation portions of the Agreement. (Triple Check's Ex. 8.)

On March 31, 1998 Debtor formed Tax Advantage, Inc. ("Tax Advantage"). Debtor testified that he had not decided to

leave Triple Check at that time but wanted to reserve a corporate name. The stock of Tax Advantage was issued to Debtor and his wife, Stacey A. Reese, as Joint Tenants by the Entirety. (Triple Check's Ex. 6.) Debtor testified the manner in which the stock was issued had nothing to do with any possible future litigation with Triple Check. Debtor testified that he understood tenancy by the entireties to mean that if one spouse dies, the other gets the property.

On July 24, 1998 Tax Advantage purchased a commercial office building for approximately $226,000.00. (Triple Check's Ex. 7.) Sometime in early 1998, Debtor obtained a phone number for Tax Advantage which was listed in the Jacksonville Beaches telephone book, published in July of 1998. (Triple Check's Ex. 10.) [1]

Despite the October, 1997 letter concerning the enforceability of the Agreement, the March 1998 formation of Tax Advantage, the July 1998 telephone book listing, and the July 1998 purchase of the commercial building, Debtor testified that he finally decided to leave Triple Check sometime in August, 1998. The Court finds Debtor's testimony incredible and finds that he decided to leave Triple Check sometime between October of 1997 and March of 1998.

On September 1, 1998 Debtor provided written notice to Triple Check that JKR would not renew the Agreement which was scheduled to expire on November 21, 1998. On September 3, 1998 Triple Check provided written notice to JKR of its intent to terminate the Agreement effective immediately.

---

1. Exhibit 10 consists of four pages. Page 1 represents the Jacksonville Beaches area of the 1998 Jacksonville telephone book. Page 1 includes a listing for Tax Advantage. Pages 2, 3, and 4 are from the Yellow Pages and include advertisements for Tax Advantage. It is unclear whether pages 2, 3, and 4 were published in 1998 or 1999.

Shortly thereafter, Triple Check filed suit in the Circuit Court of the Fourth Judicial Circuit in and for Duval County, Florida. On November 5, 1998 the Circuit Court entered a temporary injunction restraining Debtor from doing business with Triple Check's clients, whether he solicited them or not. On July 20, 1999 the First District Court of Appeal overturned the Circuit Court injunction because it was impermissibly overbroad in restricting Debtor and JKR from accepting work from unsolicited Triple Check clients. On December 3, 1999 the Circuit Court entered a consent order (the "Consent Order") which prohibited Debtor and JKR from soliciting any of Triple Check clients who were clients prior to September 3, 1998 and from serving any of Triple Check's clients whom Debtor had personally invoiced prior to September 3, 1998 or who had scheduled a "post-termination, non-Triple Check, appointment" with Debtor before September 3, 1998. (Triple Check's Ex. 3.) Attached to the Consent Order was a list of clients who had been "obtained as a result of [Debtor's] action designed to divert or take away Triple Check clients" and for whom Debtor was prohibited from providing services until November 9, 2000.

Despite the entry of the Consent Order, Debtor performed tax services for several of the listed clients during February and March of 2000. As a result, the Circuit Court entered an order on October 19, 2000 finding Debtor and JKR in willful contempt of the Consent Order. (Triple Check's Ex. 4.) On November 6, 2000 the Circuit Court entered an order sanctioning Debtor and JKR for willfully violating the Consent Order. (Triple Check's Ex. 5.) On January 5, 2001, following a trial, the

Circuit Court entered an order awarding Triple Check $51,063.60 in damages, comprised of the following: 1) $6,281.45 for lost profits; 2) $11,851.78 for the value of computer software programs taken by Debtor; and 3) $36,000.00 for the value of client lists taken by Debtor, reduced by $3,069.63, which represents Debtor's commission for services rendered prior to the termination of the agreement, but collected after termination of the agreement. The Circuit Court extended the Consent Order until November 8, 2001. (Triple Check's Ex. 2.)

On March 19, 2001 Debtor filed a Chapter 13 bankruptcy petition. On his bankruptcy schedules, Debtor valued his home which he purchased in August of 2000 at $330,000.00. Debtor claimed the stock of Tax Advantage exempt as tenancy by the entireties property.

Debtor's Chapter 13 plan provides for payments of $700.15 for the first six months of the plan and payments of $3,002.23 for the remaining thirty months. The increase in payments of $2,302.08 beginning in the seventh month represents Debtor's mortgage payment. Debtor's only other secured debt is a vehicle which the plan proposes to surrender to the lienholder. The plan proposes to pay $700.15 per month to the unsecured creditors of which Triple Check is by far the largest.[2] Unsecured creditors will receive approximately 17 %.

### CONCLUSIONS OF LAW

The Court will first address Triple Check's Objection to Debtor's claim of exemption of the stock of Tax Advantage.

---

**2.** Triple Check filed a claim in the amount of $112,870.50, approximately 80% of the total amount of unsecured claims in the case.

*OBJECTION TO EXEMPTION OF STOCK OF TAX ADVANTAGE*

 Debtor claimed the stock of Tax Advantage exempt as tenancy by the entireties property. Tenancy by the entireties is an estate that can only exist between a husband and wife where both spouses own and control the whole estate. The estate treats a marital couple as one in the eyes of the law. *Strauss v. Strauss,* 148 Fla. 23, 25, 3 So.2d 727, 728 (1941). To create a tenancy by the entireties, Florida law requires five unities to exist—(1) time—both spouses receive title in the same conveyance; (2) title—both spouses hold title to the property; (3) possession—both have equal right to use and to possess the entire property; (4) marriage—the parties must be married to one another; and (5) interest—both must have an equal interest in the whole of the property. *United States v. One Single Family Residence With Out Buildings Located at 15621 S.W. 209th Avenue, Miami, Florida,* 894 F.2d 1511, 1514 (11th Cir.1990) (citations omitted). "[A]s long as all the unities remain intact ... each spouse's interest comprises the whole or entirety of the property and not a divisible part; the estate is inseverable." *Id.* at 1514 (citations omitted). The Court finds that the unities are satisfied. Additionally, it is clear that Debtor and his wife intended to own the stock as tenants by the entireties as evidenced by Tax Advantage's stock issuance certificate.

However, Triple Check contends that Debtor converted the proceeds from directly invoiced clients, client lists and computer software into Tax Advantage and that the claim of exemption of the stock is therefore void pursuant to Fla. Stat.

§ 222.30. Fla. Stat. § 222.30 provides in pertinent part:

Fraudulent asset conversions

(1) As used in this section, "conversion" means every mode, direct or indirect, absolute or conditional, of changing or disposing of an asset, such that the products or proceeds of the asset become immune or exempt by law from claims of creditors of the debtor and the products or proceeds of the asset remain property of the debtor. The definitions of chapter 726 apply to this section unless the application of a definition would be unreasonable.

(2) Any conversion by a debtor of an asset that results in the proceeds of the asset becoming exempt by law from the claims of a creditor of the debtor is a fraudulent asset conversion as to the creditor, whether the creditor's claim to the asset arose before or after the conversion of the asset, if the debtor made the conversion with the intent to hinder, delay, or defraud the creditor.

The Court finds Triple Check's argument far-fetched. The Court finds that there is simply no link between Debtor's direct invoicing of clients and his appropriation of Triple Check's client lists and computer software and the creation of a tenancy by the entireties in the stock of Tax Advantage. Accordingly, the Court will overrule Triple Check's objection to Debtor's claim of exemption of the stock of Tax Advantage.

*OBJECTION TO CONFIRMATION*

 In order to be confirmed, a Chapter 13 plan must comply with the requirements of 11 U.S.C. § 1325. Triple Check asserts that Debtor did not file his plan in good faith as required by § 1325(a)(3).[3] A debtor has the burden of

---

**3.** "(a) Except as provided in subsection (b), the court shall confirm a plan if—
(3) the plan has been proposed in good faith and not by any means forbidden by law"

11 U.S.C. § 1325(a)(3).

proving that his plan was filed in good faith. *In re Petersen*, 228 B.R. 19, 24 (Bankr.M.D.Fla.1998) citing *In re Norman*, 162 B.R. 581, 583 (Bankr.M.D.Fla. 1993). A debtor's burden further increases if he seeks a Chapter 13 "superdischarge". *Id.* at 24. Triple Check contends that the only reason Debtor filed his Chapter 13 petition was to forestall its collection efforts.

■ The Eleventh Circuit has set forth the following non-exclusive factors for courts to consider in determining whether, under the totality of the circumstances, a Chapter 13 plan is proposed in good faith. When considering whether a Chapter 13 plan has been proposed in good faith, among factors bankruptcy court must consider are: (1) amount of the debtor's income from all sources; (2) living expenses of debtor and his dependents; (3) amount of attorney fees; (4) probable or expected duration of debtor's Chapter 13 plan; (5) motivations of debtor and his sincerity in seeking relief under provisions of Chapter 13; (6) debtor's degree of effort; (7) debtor's ability to earn and likelihood of fluctuation in his earnings; (8) special circumstances such as inordinate medical expense; (9) frequency with which debtor has sought relief under the Bankruptcy Reform Act and its predecessors; (10) circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors; (11) burden which plan's administration would place on trustee; (12) any exceptional circumstances in the case; (13) the type of debt and whether it would be nondischargeable in chapter 7; and (14) the accuracy of the plan's statements of debts and expenses and whether any inaccuracies are an attempt to mislead the court. *Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens)*, 702 F.2d 885, 888 (11th Cir.1983).

■ "Congress enacted chapter 13 to provide a highly desirable method for dealing with the financial difficulties of individuals. It creates an equitable and feasible way for the honest and conscientious debtor to pay off his debts rather than having them discharged in bankruptcy." *Jim Walter Homes, Inc., v. Saylors (In re Saylors)*, 869 F.2d 1434, 1436 (11th Cir.1989) (quoting H.R.Rep. No. 193, 86th Cong., 1st Sess. 2 (1959)). The Eleventh Circuit further stated that "[t]he good faith requirement of 11 U.S.C. § 1325(a)(3) is sufficient to prevent undeserving debtors from using this procedure, yet does not prevent deserving debtors from using the procedure." *Id.*

■ Triple Check concedes that: 1) Debtor has not incurred unreasonable attorney's fees; 2) Debtor has not sought bankruptcy protection before; 3) the administration of the plan places no undue burden on the trustee; and 4) the plan's statement of debts and expenses is accurate. The Court turns to the other factors relevant to the good faith inquiry.

### Living Expenses of Debtor and his dependents

The Court is troubled by Debtor's $2,300.00 house payment for a $330,000.00 house that was purchased in August of 2000, some seven months prior to the filing of the petition and during the height of litigation with Triple Check. Although the allocation is protected from the disposable income scrutiny, the Court finds that its excessiveness evidences a lack of good faith. *See In re Kirschner*, 259 B.R. 416, 424 (Bankr.M.D.Fla.2001).

### Expected duration of Debtor's Chapter 13 Plan and Debtor's degree of effort

Although Debtor proposes only a thirty six month plan, a sixty month plan would

increase the distribution to unsecured creditors from approximately 17% to approximately 24%.

### Debtor's motivations and sincerity in seeking Chapter 13 relief

Evidence that a petition was filed to delay or frustrate the legitimate efforts of creditors is an important factor in the Court's analysis of a debtor's motivation and sincerity. The Court finds that Debtor's primary purpose in seeking Chapter 13 relief was to diminish Triple Check's recovery on its claim. Debtor filed his petition some two months after Triple Check obtained an approximate $51,000.00 judgment, the result of more than two years of litigation. Debtor did not file the case to cure an arrearage on a secured asset or to save personal property.

### Special or Exceptional Circumstances

There are no special or exceptional circumstances in the case.

### Circumstances under which Debtor contracted his debts and dealings with creditors and the type of debt sought to be discharged and whether it would be dischargeable in a Chapter 7

Debtor's conduct and the circumstances under which he contracted the debt owed to Triple Check evidence a pattern of complete disregard for the Agreement and a failure to abide by court orders. Debtor decided to leave Triple Check sometime between October of 1997 when he requested legal advice on the enforceability of the non-compete and non-solicitation portions of the Agreement and March of 1998 when he formed Tax Advantage. Debtor took computer software and client lists which belonged to Triple Check. He personally invoiced clients and failed to turn over Triple Check's portion of the fees. He willfully violated the Consent Order. Taken together, these facts do not bespeak good faith.

Additionally, a Chapter 13 plan which serves no purpose other than to discharge an otherwise non-dischargeable debt evidences a lack of good faith. *Petersen,* 228 B.R. at 26. Although it makes no explicit determination, the Court finds it highly likely that the debt owed to Triple Check would be non-dischargeable in a Chapter 7 case.

In light of 1) Debtor's excessive living expenses, 2) the Chapter 13 plan's minimum duration, 3) Debtor's motive in seeking Chapter 13 relief, 4) the circumstances under which Debtor contracted the debt with Triple Check, and 5) the likelihood that the debt owed to Triple Check would be non-dischargeable in a Chapter 7 case, the Court finds that Debtor failed to meet his burden of proving that the plan was filed in good faith. Accordingly, the Court will deny confirmation.

### CONCLUSION

Because Triple Check failed to prove that Debtor converted Triple Check assets into Tax Advantage, the Court will overrule Triple Check's objection to Debtor's claim of exemption of the stock of Tax Advantage. Because Debtor failed to prove that he filed his plan in good faith, the Court will sustain Triple Check's Objection to Confirmation of Debtor's Amended Chapter 13 plan and will deny confirmation. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.