**In re: Kevin Saul MEYER and Elizabeth Pauline Meyer, Debtors.**

**No. 13–06–11376 SA.**

United States Bankruptcy Court, D. New Mexico.

Dec. 5, 2006.

---

Ronald E Holmes, Albuquerque, NM.

Kelley L. Skehen, Albuquerque, NM.

Alice Nystel Page, Albuquerque, NM.

Melissa R. Perry, Executive Office for UST, Washington, DC.

## MEMORANDUM OPINION AND ORDER NOT CONFIRMING DEBTORS' CHAPTER 13 PLAN

JAMES S. STARZYNSKI, Bankruptcy Judge.

This matter raises the question of whether the Bankruptcy Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")[1] permits chapter 13 debtors with current monthly income in excess of the median family income, to treat charitable contributions as reasonably necessary expenses. It does not. In consequence, Debtors' chapter 13 plan, which is based on such deductions, cannot be confirmed at this stage of the proceedings.

### Procedural Background

On August 11, 2006, Debtors Kevin and Elizabeth Meyer filed their chapter 13 petition (doc 1). With the petition the Debtors also filed their schedules, statement of financial affairs, and Form B22C. Line 16 of Schedule I shows combined total monthly income of $5,485, and line 18 of Schedule J shows total monthly expenses of $5,150, resulting in "monthly net income" (line 20(c)) of $335. Schedule J lists two dependents[2] and includes an entry on line 10 of $416 for charitable contributions. The Debtors' monthly net income figure would therefore be $751 were the Debtors not scheduling the charitable contribution. Form B22C recites on the first page that the applicable commitment period is five years and that disposable income is determined under § 1325(b)(3). Lines 15 and 21 of Form B22C show annualized income of $78,397, and lines 16 and 22 show $48,858 as the annual median income for a family of four in New Mexico. Line 45 for "Continued Charitable Deductions" shows $416. The Total of All Deductions Allowed under § 707(b)(2) in lines 52 and 56 is $6,642, and Total Current Monthly Income from lines 20 and 53 is $6,533, so that the Monthly Disposable Income in line 58 is negative $109 (rounded slightly up). But for the $416, the Monthly Disposable Income figure would be positive $307. Sixty months of such payments would total $18,420.

Debtors scheduled one claim as undersecured by $4,029 (Schedule D), unsecured priority claims of $5,503 (Schedule E) and non-priority unsecured claims of $31,943 (Schedule F). Thus, the Debtors scheduled unsecured claims total approximately $36,000. As of the date of this opinion (prior to the expiration of any deadline for filing claims) approximately $2,184 of priority claims and $85,460 of unsecured claims have been filed.

---

1. Pub.L. No. 109–8, 119 Stat. 37 (2005). References to the Code in this memorandum opinion and order are to the Bankruptcy Code as amended by BAPCPA unless otherwise stated.

2. One of the dependents is identified as a niece. No one has objected to that listing. *See In re Gonzales,* 297 B.R. 143 (Bankr. D.N.M.2003) (dependents may include members of extended family).

Debtors' Chapter 13 Plan and Related Motions (doc 2) provides in relevant part that Debtors will pay to the Chapter 13 Trustee $475 per month for sixty months, for a total of $28,500. The Plan also states that the best interests of creditors test of § 1325(a)(4) requires no payments to unsecured creditors. The Trustee objected that the Plan failed to commit the Debtors' disposable income to the Plan, and specifically objected to the charitable contributions. Both the Debtors and the United States Trustee ("UST") oppose the objection and urge the Court to confirm the Plan.

### Analysis

In 1998, Congress enacted the Religious Liberty and Charitable Donation Protection Act of 1998 ("RLCDPA", an acronym even more unpronounceable than BAPCPA), which amended the Code to permit, among other things, debtors to direct a portion of their chapter 13 plan payments to charitable contributions instead of to payment of their debts. Thus, prior to its amendment by BAPCPA, § 1325(b)(2) (A) provided that

> [f]or purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
> (A) for the maintenance or support of the debtor or a dependent of the debtor,

including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; . . .

So written, the charitable contribution "option" was available to any chapter 13 debtor.[3] In particular, because there was no distinction in the statute between above median and below median debtors, the size of the debtor's income had no bearing on the availability of the option (other than the obvious practical one: did the Debtor have enough money to make the donation and still be able to perform the plan).

When Congress enacted BAPCPA, it significantly rewrote the statute. Section 1325(b) now provides in relevant part as follows:

> (1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

**3.** Whether the debtor is entitled to make the contributions if he or she had not been doing so prior to filing the petition might have been an issue. *See* § 707(b)(1) (court may not take into consideration "whether a debtor has made, or continues to make, charitable contributions") and Form B22C, line 45 ("Continued Charitable Deductions"). *See also In re Smihula,* 234 B.R. 240, 242 (Bankr.D.R.I. 1999) ("This language, which needs no interpretation or construction, *requires* that as of the petition date the debtor had established a history of charitable giving.") (Emphasis in original). *Compare Drummond v. Cavanagh (In re Cavanagh),* 250 B.R. 107, 111–15 (9th Cir.BAP2000) (wording of § 1325(b)(2)(A)

permits confirmation of a chapter 13 plan in which debtors begin tithing upon filing of the petition). Question 7 of the Debtors' Statement of Financial Affairs—Gifts (which specifically includes charitable contributions)—is marked "none". At the hearing, Debtors' counsel assured the Court that the answer to SOFA question 7 was a mistake and would be amended to show that the Debtors had been tithing to their church for at least a year prior to the filing of the petition. The parties agreed that the hearing could go forward on that assumption. Debtors have now amended their answer to SOFA question 7 to show contributions dating back to January 2006 (doc 33).

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor ... less amounts reasonably necessary to be expended—

(A) (I) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

(3) Amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than—

(A) ...;

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(C) ....

Section 707(b), as amended by BAPCPA, in turn provides as follows:

(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

(2) (A)(i) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of—(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or (II) $10,000.

(ii) (I) The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise

a dependent. Such expenses shall include reasonably necessary health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, or the dependents of the debtor. Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts. In addition, the debtor's monthly expenses shall include the debtor's reasonably necessary expenses incurred to maintain the safety of the debtor and the family of the debtor from family violence as identified under section 309 of the Family Violence Prevention and Services Act, or other applicable Federal law. The expenses included in the debtor's monthly expenses described in the preceding sentence shall be kept confidential by the court. In addition, if it is demonstrated that it is reasonable and necessary, the debtor's monthly expenses may also include an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service.

(II) In addition, the debtor's monthly expenses may include, if applicable, the continuation of actual expenses paid by the debtor that are reasonable and necessary for care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family (including parents, grandparents, siblings, children, and grandchildren of the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case who is not a dependent) and who is unable to pay for such reasonable and necessary expenses.

(III) In addition, for a debtor eligible for chapter 13, the debtor's monthly expenses may include the actual administrative expenses of administering a chapter 13 plan for the district in which the debtor resides, up to an amount of 10 percent of the projected plan payments, as determined under schedules issued by the Executive Office for United States Trustees.

(IV) In addition, the debtor's monthly expenses may include the actual expenses for each dependent child less than 18 years of age, not to exceed $1,500 per year per child, to attend a private or public elementary or secondary school if the debtor provides documentation of such expenses and a detailed explanation of why such expenses are reasonable and necessary, and why such expenses are not already accounted for in the National Standards, Local Standards, or Other Necessary Expenses referred to in subclause (I).

(V) In addition, the debtor's monthly expenses may include an allowance for housing and utilities, in excess of the allowance specified by the Local Standards for housing and utilities issued by the Internal Revenue Service, based on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses and demonstrates that such actual expenses are reasonable and necessary.

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's de-

pendents, that serves as collateral for secured debts; divided by 60.

(iv) The debtor's expenses for payment of all priority claims (including priority child support and alimony claims) shall be calculated as the total amount of debts entitled to priority, divided by 60.

(B) (i) In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, .... [4]

 The "natural reading" [5] of the foregoing language is that debtors may treat charitable contributions (as defined and delimited in § 548(d)) as reasonably necessary expenditures, except that debtors with incomes over the applicable state median income must instead look to § 707(b)(2)(A) and (B) to determine what they are allowed as reasonably necessary expenditures. Section 707(b)(2)(A) (ii) provides a specific itemization of what those reasonably necessary expenses may be. The itemization does not include charitable contributions. In consequence, Debtors, because of their over-median income, are not entitled to claim charitable contributions as necessary expenses in calculating their disposable income for their plan.[6]

 The United States Supreme Court has repeatedly declared, including in cases interpreting the Code, that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *E.g., Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). (Citations omitted.) In this instance, the language is plain. Nevertheless, the Debtors and the United States Trustee argue against this interpretation of the statute on several grounds.[7]

---

**4.** Section 707(b)(2)(B) allows additional expenses for special cases such as a serious medical condition or a call to active duty in the Armed Forces. The Debtors do not claim that they have any special circumstances, so that § 707(b)(2)(B) is irrelevant for purposes of this case.

**5.** The phrase is from *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 ("The natural reading of the phrase [from § 506(b)] ...."") and 245 ("this natural interpretation of the statutory language") (1989); *see also Lamie v. United States Trustee*, 540 U.S. 526, 543, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (concurring opinion): "This evidence convinces me that the Court's reading of the text, which surely is more natural than petitioner's, is correct." The UST arrives at a "natural reading" of the statutes exactly the opposite of the Court's reading. The United States Trustee's Response in Support of Charitable Contribution Expense Allowance in Chapter 13 Plans ("UST Response"), at 5 (doc 17). So perhaps naturalness is merely in the eye, or mind, of the beholder.

**6.** That line 45 of Form B22C is labeled "Continued Charitable Deductions" and is to be filled out by an above-median debtor cannot be used to change the language or the meaning of the statute. "The forms shall be construed to be consistent with these rules and the Code." F.R.B.P. 9009. In other words, one looks to the statute to determine what the law is, and then interprets the form in light of the statute's dictate.

**7.** At the confirmation hearing Debtors raised the argument that application of the statute as the Court interprets it violates Debtors' First Amendment rights by hindering the exercise of their religion. Consistent with the maxim that a court should reach a constitutional issue only after all other grounds for a ruling have been disposed of, *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), the Court ruled that it would decide whether the Plan should be confirmed based only on statutory grounds, and if it did not confirm, the parties could brief the constitutional issues.

■ The UST argues first that § 1325(b)(2) makes qualifying charitable contributions reasonable expenses per se, and therefore there is no need to resort to § 1325(b)(3) to consider that question again for above-median income debtors. The problem with that argument is that it effectively tells a court to ignore § 1325(b)(3) on this issue, in effect treating § 1325(b)(3) as mere surplusage. While there are times when a reasonable interpretation of the statute requires a portion of it to be ignored, *id.*, at 536, 124 S.Ct. 1023 ("[O]ur preference for avoiding surplusage constructions is not absolute," citing *Chickasaw Nation v. United States,* 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001)), those instances are exceptions to the usual statutory canon of not treating any part of the statute as surplusage. *See, e.g., United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)(The "cardinal principle" of statutory construction is to save, not destroy; the Court's duty is to give effect to every clause and word of a statute if possible.) In this case, there is no need to even consider the rules concerning surplusage if the statute is read naturally. Ignoring a portion of the statute, then, is not the answer.

The UST argues that the statute must be considered as a whole, that the Court "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy" (quoting *Regions Hospital v. Shalala,* 522 U.S. 448, 460 n. 5, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998)), and that statutory construction is a "holistic endeavor", quoting *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). From these premises the UST concludes that "[t]o interpret § 1325(b) as foreclosing *only* above median income debtors from deducting their charitable contributions fails to read the statute in a way that gives meaning to all of its provisions...." UST Response, at 5. The UST accurately recites the various rules for statutory interpretation. However, the conclusion does not follow from those premises. In this instance, a reading of the statute as a whole leads to precisely the opposite conclusion; namely, the Congress did foreclose above-median income debtors from deducting charitable contributions.

In the same sentence, the UST argues that the Court's interpretation "is contrary to the history of charitable contribution deductions in chapter 13 cases." This is true; before BAPCPA all chapter 13 debtors could deduct as reasonably necessary expenses qualifying charitable contributions. But that was then and this is now. Or, as the Supreme Court has phrased it, "The starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes." *Lamie,* 540 U.S. at 534, 124 S.Ct. 1023 (§ 330(a)(1) as amended does not authorize the payment of attorney's fees unless the attorney has been appointed under § 327). (Internal citation omitted.)

Note that this analysis does not constitute a ruling that Congress repealed RLCDPA by implication or otherwise. It merely rules that Congress effectively limited its applicability in a certain well defined circumstance. That does not constitute repeal of RLCDPA. And modifying the reach of RLCDPA is certainly not the same as repealing by implication a policy deeply embedded in the history of bankruptcy such as, for example, not paying postpetition interest on undersecured or unsecured claims. *Cf. Timbers of Inwood,* 484 U.S. at 373, 108 S.Ct. 626. The Court is obliged to regard both RLCDPA and BAPCPA as effective. *United States v. Continental Tuna Corp.,* 425 U.S. 164, 168,

96 S.Ct. 1319, 47 L.Ed.2d 653 (1976); *Yellowfish v. City of Stillwater*, 691 F.2d 926, 928 (10th Cir.1982). That is what this Court's analysis does.

The UST's stronger argument hinges on § 707(b)(2) incorporating by reference § 707(b)(1), which includes the charitable contribution language. From this she argues that Congress mandated the right of an over-median chapter 13 debtor to use the charitable contribution deduction when it mandated use of § 707(b)(2). The UST's argument in effect conflates two purposes of the statute.

Congress essentially used § 707(b)(2) as a sort of shorthand for the list of expenses that over-median debtors could deduct. That is a distinct but not contradictory use of that part of a statute which has a different purpose altogether; namely, providing a standard by which a court should determine when a chapter 7 case should be dismissed or converted because the filing is an abuse of chapter 7. In this latter context, Congress wanted to make it clear that a case should not be dismissed or converted because the debtor had been making charitable contributions. So in considering dismissal or conversion, the charitable contribution language is critical. It is not at all critical if § 707(b)(2) is being used merely as a list of permitted deductions.[8]

■ At the confirmation hearing, the UST argued that construing the statute this way is an absurd construction of the language and of the Congressional intent concerning charitable deductions. It is true that the plain meaning of the legisla-tion will not be treated as conclusive "in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters", *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (Internal punctuation and citation omitted.), in which case the intention of the drafters, rather than the strict language, controls. *Id.* But as shown above, the Court's reading of the statute is natural, and certainly the language of the statute is not internally inconsistent.

■ In fact, the Trustee describes a tidy scenario in which Congress could have made the conscious decision to not permit wealthier debtors to deduct charitable contributions.

> The distinction in treatment of under-median and above-median debtors with respect to the deduction of charitable contributions may have a basis in their respective financial circumstances. It may be presumed that below-median debtors are making sacrifices in other areas of their budget to make charitable contributions. In the case of above-median debtors, there may be no such sacrifice, but merely a reduction of the available funds that would otherwise be available to pay their creditors.

Chapter 13 Trustee's Memorandum Brief in Support of Objection to Confirmation of Debtors' Chapter 13 Plan, at 8 n. 3 (doc 21). Perhaps the Trustee's speculation is correct, although given the benefits that BAPCPA provides to wealthier debtors[9] and Congress' protectiveness for charita-

---

8. This same conclusion applies to the UST's observation that the actual list of deductions appears in only a part of the statute referenced; namely, § 707(b)(2)(A)(ii).

9. For example, Form B22C, which is based on the statute, permits an above-median debt-or to deduct various expenses that a below-median debtor may not deduct. The result is that a debtor with income slightly above the median may well show less disposable income available for creditors than the debtor whose income is below the median.

ble contributions, the result may be more the result of inadvertence or the lack of proofreading than of intent.[10] Nevertheless, whether the Trustee's theory is or is not correct is not the point as such. Rather, what the Trustee's theory demonstrates is that the statute is not absurd; there is at least one way that it can be considered perfectly rational. "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *Ron Pair Enterprises*, 489 U.S. at 240–41, 109 S.Ct. 1026. The UST's stretch to make it "absurd" is precisely that, a stretch not justified by the language.[11]

■■■ Whether the statute as written is contrary to what Congress intended is concededly a somewhat closer question given Congress' continued efforts to protect charitable contributions. Notably the UST has not submitted to the Court any explicit legislative history or other source (other than the continuing existence of RLCDPA) which demonstrates clearly that Congress specifically intended over-median debtors to be able to deduct charitable contributions. Congressional intent is obviously very important, but what that intent is will ordinarily be garnered from a reading of the statutory language that Congress used. "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says.... When the words of a statute are unambiguous, then, this first canon [of interpretation] is also the last: 'judicial inquiry is

complete.' " *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). (Citations omitted.) If it then turns out that Congress did not write what it meant to say, it must be Congress that rewrites the statute to fix the mistake. *Lamie*, 540 U.S. at 542, 124 S.Ct. 1023.

At the confirmation hearing, the UST also drew a distinction between the wording of § 1325(b)(3) ("Amounts reasonably necessary to be expended under paragraph (2) shall be determined *in accordance with* subparagraphs (A) and (B) of section 707(b)(2)" [emphasis added] ) and wording that the UST correctly points out Congress did not use; namely, "Amounts...shall be determined *by* subparagraphs (A) and (B) ...." Thus the UST argues that the statute allows over-median debtors to use the deductions specified in § 707(b)(2)(A) and (B) but does not limit those debtors to those deductions. That view then allows the UST to argue that the reference to the charitable contribution deduction in § 707(b)(1) is available to over-median debtors since the over-median debtor is not limited to the specified deductions.

In effect the UST attaches a specific meaning to the phrase "in accordance with" and then uses the phrase to be able to include the charitable contribution language from another part of the statute. The argument is beguiling but still fails.

To start with, the argument places enormous importance on the wording "in accordance with" being interpreted very narrowly and specifically as she wants it. The

---

**10.** The UST has wisely not argued that Congress intended to do one thing but, because of a drafting error or some other reason, wrote something else. Any relief stemming from that argument has been precluded by *Lamie.*

**11.** How far the UST has stretched to find absurdity contrasts with a genuine example of

absurdity in BAPCPA; namely, § 521(i), which explicitly authorizes the debtor to request an extension of time to file the information required by § 521(a)(1) but appears not to authorize the Court to grant the debtor's request.

word "accordance" is largely synonymous with "agreement" or "conformity", Webster's Ninth New Collegiate Dictionary 50 (1991), at 50, and "accordance" is now largely used in the phrase "in accordance with" to mean "in agreement with". Webster's Third New International Dictionary Unabridged 13 (1991). So the wording directs a debtor to have his or her deductions agree with those listed in § 707(b)(2)(A) and (B). In a sense this is a form of limitation (which is the qualification that the UST argues is part of the word "by"); if the deductions don't agree with those listed in § 707(b)(2)(A) and (B), they are not allowed. This interpretation of the words is a simple one, but it is what they say. And this interpretation makes "in accordance with" no different than "by" (at least in this context), thereby eliminating the artificial distinction that the UST draws between the two terms.

For her argument to succeed, then, the UST needs to present some other evidence that Congress intended the phrase "in accordance with" and the list of exemptions in § 707(b) to be only the starting point rather than the ending point of the debtor's listing of deductions. She argues that the history and the importance of the charitable contribution deduction are that evidence. By themselves they are not, especially when compared to the simple and natural interpretation of the words in a context that acts as a limitation.

Part of the UST's problem is that it would have been much easier for her had Congress simply declared, point blank, that over-median debtors were entitled to the charitable deduction *in addition to* the deductions in § 707(b)(2)(A)(ii). So the UST relies on various rules of statutory construction to deal with this problem. But at some point the use of all those rules obscures rather than reveals the meaning of the words, especially when, as here, a relatively simple and clear interpretation is readily available.

■ Much the same analysis applies to the UST's use of the rule about specific language governing general language. While that is certainly one of the rules of statutory interpretation, in this case RLCDPA and BAPCPA do not bear the relationship of, respectively, specific versus general. In fact, one could argue the opposite; against the background of RLCDPA, BAPCPA specifically limited the coverage of RLCDPA in certain circumstances in chapter 13 cases. And in any event, the UST's reliance on the history and earlier passage of the RLCDPA run afoul of another rule of statutory construction; namely, that statutes must all be construed *in pari materia* if possible, regardless of the differing dates of enactment. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (taxation of litigation costs).

■ Also at the confirmation hearing the UST emphasized that Congress had been careful to incorporate the provisions of RLCDPA into BAPCPA. But Congress did not go so far as to, at least explicitly, incorporate the charitable contribution deduction into § 707(b)(2) (A)(ii). Thus the UST's argument instead leads to the conclusion that Congress was careful to not allow the deduction if a debtor was required to use § 707(b)(2). The contrast between that section, which over-median debtors must use, and § 1325(b)(2)(A), available to under-median debtors, is apparent. "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993).

The Court agrees with the UST that RLCDPA did away with a court's authority to examine the reasonableness of the contribution as long as the contribution meets the definition and amount specified in the statute. *Drummond v. Cavanagh (In re Cavanagh)*, 250 B.R. 107, 112–13 (9th Cir.BAP2000); *In re Petty*, 338 B.R. 805, 808 (Bankr.E.D.Ark.2006); *In re Kirschner*, 259 B.R. 416, 422 (Bankr.M.D.Fla. 2001); *contra, In re Buxton*, 228 B.R. 606 (Bankr.W.D.La.1999). However, this fact is beside the point; the issue in this case is whether Debtors have the authority to invoke the provisions of RLCDPA at all, not whether the amount and the proposed donee of the contribution are reasonable. The UST's attempt to stretch the "don't examine" mandate of the RLCDPA to have the Court not look at whether Debtors are entitled to the deduction to begin with must fail.

**Conclusion and Order**

█ BAPCPA's differing treatment of the deductions allowed to under-median vs. over-median debtors is clear and reasonable. Neither the UST nor the Debtors have presented a reason, based on statutory interpretation, to ignore what appears to be the will of Congress as expressed in the statute.[12] In consequence, a chapter 13 plan which provides that these over-median debtors may take a charitable contribution deduction that the Code does not permit them to take, cannot be confirmed. Unless the Debtors can now show that Congress, through BAPCPA, has deprived Debtors of the free exercise of their religion by legislating this distinction, the Court will deny confirmation of the Debtors' plan.

IT IS THEREFORE ORDERED as follows:

1. At this time the Debtors' chapter 13 plan is neither confirmed nor denied;

2. The Debtors' shall have 45 days from the entry of this order to file a brief in support of their position that the Code as amended by BAPCPA deprives the Debtors of the free exercise of their religious beliefs in violation of the First Amendment to the United States Constitution; if they fail to file the brief timely (or if they, prior to the 45 days, inform the Court and the other parties that they will not be filing such a brief), the Trustee shall submit to the Court a form of order denying confirmation of the plan;

3. The UST and the Trustee shall have 30 days after the filing of the Debtors' brief to file a response brief, and the Debtors shall have 15 days thereafter to file a reply brief.[13]

4. If the Court enters an order denying confirmation of the plan, the Debtors, within 15 days of the entry of the order denying confirmation, may file an amended plan or may convert the case; and

5. If confirmation of the plan is denied and Debtors do not file an amended plan or convert the case within the 15 days, the Trustee shall submit to the Court a form of order dismissing the case.

12. This Court reaches the same conclusion as did the court in *In re Diagostino*, 347 B.R. 116 (Bankr.N.D.N.Y.2006). In doing so, this Court has not felt it necessary to resort to legislative history.

13. If the UST decides to support the Debtors on the First Amendment issue, she shall file her "response" or supporting brief no later than 10 days after the filing of the Debtors' brief so that the Trustee can respond to both briefs at the same time.